TALKIN, MUCCIGROSSO & ROBERTS, L.L.P.
ATTORNEYS AT LAW
40 EXCHANGE PLACE
18TH FLOOR
NEW YORK, NEW YORK 10005

(212) 482-0007 PHONE
(212) 482-1303 FAX
WWW.TALKINLAW.COM
EMAIL: INFO@TALKINLAW.COM

MARYLAND OFFICE:
5100 DORSEY HALL DRIVE
SUITE 100
ELLICOTT CITY, MD 21042
410-964-0300

NEW JERSEY OFFICE:
79 MAIN STREET
SUITE ONE
HACKENSACK, NJ 07601
201-342-6665

January 21, 2008

The Honorable Richard M. Berman
United States District Judge
Southern District of New York
500 Pearl Street, Room 650
New York, New York 10007

BY HAND DELIVERY AND ECF

                    Re:    United States v. Tremaine Tazewell
                              07 Cr. 1035 (RMB)

Dear Judge Berman:

        On August 13, 2007, United States Magistrate Judge Andrew Peck set bail for defendant as follows, "One -million dollar personal recognizance bond, cosigned by six financially responsible persons and the grandfather as a seventh person for moral suasion, further supported by $5000,000 cash and property." Detention Hearing Transcript ("hereinafter" Det Hrg), p. 12. Magistrate Peck also required "defendant [] to live with his aunt and uncle, as noticed by – as described by Mr. Talkin[1]." Det Hrg, p. 13. In order to place this requirement in context, at the detention hearing, I argued that the aunt's supervision is further assurance to the Court that defendant will not be a danger to the community. Det Hrg, pp.7, 10. Defendant was released on September 26, 2007, after satisfying all of the bail conditions.

        At the time of his arrest, defendant's fiancé, Takisha Womack was pregnant and she gave premature birth to their child on November 11, 2007. Since that time, defendant has been unable to live with his child because his aunt and uncle, the Bulgers, are elderly and are unable to cope with a

---

[1] Within defendant's presentment of his bail package to the Magistrate, I stated, "The package also does include home detention with electronic monitoring. He would live in one of the houses that's posted with his aunt and uncle, at 37 Esperanza Court in Baltimore, Maryland. That is in a neighborhood called "Pikesville," which is not the same neighborhood where he's been living before, it's in a different part of Baltimore." Det Hrg., p. 6.

newborn in their home and they do not have room to accommodate the baby and Ms. Womack. For this reason, defendant respectfully requests that his bail conditions be modified to permit him to live at 5407 Summerfield Avenue, Baltimore, Maryland, 21206. This home is owned by defendant and has been posted as collateral as part of defendant's Bond.

Officer Todd Stokes of Pretrial Services in Baltimore, Maryland, who monitors defendant, consents to this application as does the Government, by Assistant United States Attorney David O'Neil.

Thank you for Your Honor's consideration of this request.

Very truly yours,

Sanford Talkin

cc:   AUSA David O'Neil by ECF
      PTS Officer Todd Stokes by fax (w/out attachments)

```
 1                   UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK
 2
                                        .
 3   THE UNITED STATES OF AMERICA,      .  Case No. 07-cr-01035-RMB
                                        .
 4                 Complainant,          .
                                        .  New York, New York
 5           vs.                         .  Monday, August 13, 2007
                                        .
 6   TREMAIN ARRNEL TAZEWELL,            .
                                        .
 7                 Defendant.            .
     . . . . . . . . . . . . . . .
 8
                       TRANSCRIPT OF BAIL HEARING
 9              BEFORE THE HONORABLE ANDREW J. PECK
                   UNITED STATES MAGISTRATE JUDGE
10
     APPEARANCES:
11
     For the Government:         Jocelyn E. Strauber, Esq.
12                               OFFICE OF THE U.S. ATTORNEY
                                 One St. Andrew's Plaza
13                               New York, New York 10007

14   For the Defendant:          Sanford N. Talkin, Esq.
                                 TALKIN, MUCCIGROSSO & ROBERTS
15                               40 Exchange Place
                                 New York, New York 10005

16

17

18

19

20   Audio Operator:             Electronically Recorded
                                 by Court Personnel
21
     Transcription Company:      Rand Reporting & Transcription, LLC
22                               80 Broad Street, Fifth Floor
                                 New York, New York 10004
23                               (212) 504-2919
                                 www.randreporting.com
24
     Proceedings recorded by electronic sound recording, transcript
25   produced by transcription service.
```

1       (Proceedings commence.)

2       THE CLERK: United States v. Tremain Tazewell, 07-m-
3  786.

4       Counsel, please state your appearances for the record.

5       MS. STRAUBER: Good afternoon, Your Honor. Jocelyn
6  Strauber for the Government.

7       MR. TALKIN: Sam Talkin for Mr. Tazewell. Good
8  afternoon, Your Honor.

9       THE COURT: Good afternoon. I understand we're here
10 for a bail hearing. All right.

11      MS. STRAUBER: That's correct, Your Honor.

12      THE COURT: Are both counsel prepared to proceed?

13      MR. TALKIN: Yes, Your Honor.

14      MS. STRAUBER: Yes, Your Honor.

15      THE COURT: All right. Proceed.

16      MS. STRAUBER: Your Honor, the Government seeks
17 detention in this case. As the Court is aware from the
18 complaint, the defendant is charged with participating in a
19 B(1)(a) heroin conspiracy, which carries a mandatory minimum
20 sentence of ten years; this is therefore a presumption.

21      In addition, as I'll address in greater detail in a
22 moment, the defendant has three prior narcotics felony
23 convictions. Should the Government file a two prior felony
24 informations in this case, the defendant would then be facing a
25 mandatory minimum term of life; should the Government file one

1  of those prior felony informations, defendant would be facing a
2  mandatory minimum of twenty years.
3       Now, despite the defendant's three prior narcotics
4  convictions, he has served relatively short periods of time for
5  each of those, as is reflected in the presentence report, and
6  it is largely for that reason that the Government considers the
7  defendant a risk of flight, even in consideration of the
8  substantial bail package that I know that defense counsel will
9  propose, which would include home confinement with electronic
10 monitoring.  This defendant is facing a potential sentence that
11 is really on an order greater than anything that he has served
12 before.
13      In addition, the three drug convictions, I think, by
14 themselves, in addition to the nature of the charge in this
15 case, show the danger that this defendant poses to the
16 community.  It's also worth noting that the instant offense was
17 committed when the defendant was on parole from his early-2002
18 drug conviction.  He was sentenced to three to six years, but I
19 believe served less than a year on that offense, as he was
20 sentenced in early '02, and apparently on parole by August of
21 '02.  So this crime was committed shortly after that.  In fact,
22 in the defendant's post-arrest statement, he admitted that he
23 had distributed heroin even after his release from prison in
24 New York, by which I believe he was referring to his 2002
25 sentence.

4

1   He also made, you know, a number of other significant
2   acknowledgements in his statements to the agents; most
3   particularly, as I just mentioned, admitting to his
4   distribution of heroin, although he did dispute a number of the
5   facts as set forth in the complaint.
6       As the complaint indicates, it's the Government's
7   position, not only that the defendant was involved in a heroin
8   distribution conspiracy, but that he was one of the leaders of
9   it, and that he directed other individuals to do a number of
10  different things for him, including traveling to New York to
11  obtain and test the quality of heroin that was then brought
12  back to Baltimore to be sold there.
13      It's partly for that reason that the Government is of
14  the view that even home confinement with electronic monitoring,
15  particularly if that home confinement is to take place
16  relatively close to the area where the defendant has resided
17  previously and has conducted his narcotics business, is simply
18  insufficient to protect the community from the possibility that
19  the defendant will continue to use those people who have worked
20  for him in the past to continue his narcotics business, even if
21  he is personally limited by the restrictions of home
22  confinement with electronic monitoring.
23      In addition, the substantial sentence that he's
24  facing, particularly in light of the admissions that he has
25  already made in this case.  It's for that reason that the

1  Government does not feel that even the very substantial bail
2  package that I know is going to be presented here today is
3  sufficient to diminish the risk of flight posed by this
4  defendant.
5          And just finally, as the pretrial services report also
6  notes, the defendant poorly adjusted to community supervision
7  in the past; had multiple arrests while he was on pretrial
8  release, and has a history of violating his probation.
9          So, for all those reasons, it's the Government's
10 position that detention in this case is the only way to secure
11 the defendant's appearance in court, and to protect the safety
12 of the community.
13         THE COURT:  All right.  Mr. Talkin.
14         MR. TALKIN:  Your Honor, I'll start with the package
15 that I have, just so we can discuss it in that framework.
16         What Mr. Tazewell proposes is a one-million-dollar
17 bond, partially secured by over $450,000 in equity in
18 properties; a total of six properties -- which I'll break down
19 for Your Honor three and three, because three are owned by
20 relatives and a close family friend; three are owned by the
21 defendant -- as well as seven cosigners, five of which are here
22 -- six of which are here today.  They traveled all the way from
23 Maryland to come up and support Mr. Tazewell, which is a very
24 important factor, which we'll discuss in a minute, regarding
25 whether he's a risk of flight, and regarding the incredible

1  amount of moral suasion placed on Mr. Tazewell against risk of
2  flight.
3         One of the individuals -- just so Your Honor is clear
4  on this, one of the individuals is not a financially secure
5  individual; it's his grandfather, and he's a retired member of
6  the merchant marine, and that's obviously there for important
7  moral suasion, because the bond exceeds the secured property.
8  So there's a serious consequence to all of these people, should
9  he not return to the jurisdiction.
10        The package also does include home detention with
11 electronic monitoring.  He would live in one of the houses
12 that's posted with his aunt and uncle at 37 Esperanza Court in
13 Baltimore, Maryland.  That is in a neighborhood called
14 "Pikesville," which is not the same neighborhood where he's
15 been living before; it's in a different part of Baltimore.
16        The first thing I want to direct the Court's attention
17 to is that, if you read the complaint, the conduct that's
18 alleged in the complaint stopped a year ago.  They didn't
19 arrest Mr. Tazewell for one year after the allegations were
20 made.  That's important because that gave Mr. Tazewell,
21 unbeknownst to him, the opportunity to prove to this Court, not
22 through the words of his attorney or even his own words, but
23 through his actions, that he's not a danger to the community.
24        Most certainly, the Government was conducting an
25 investigation during this year.  They were watching him.  The

1  complaint is clear that they had him identified as the
2  individual they were looking for.  They had opportunity to do
3  wiretaps, make consent telephone calls.  They had opportunity
4  to do controlled buys.  They had opportunity to have
5  cooperators engage him in narcotics activity.  It didn't
6  happen, even though they had all of those opportunities.  And
7  the reason it didn't happen is because, in the last year, he
8  has demonstrated to the Court that he is not a danger.  When
9  you through -- danger to the community.
10          When you throw on top of that, that -- two things:
11 One, the electronic monitoring that's going to take place and
12 the home detention with only leave to leave his house for
13 employment, but when you put that -- if that's possible --
14          THE COURT:  Don't hold your breath on that one.
15          MR. TALKIN:  I got you, Your Honor.
16          But when you put that on top, and that his aunt will
17 be there to monitor him, who's in court here today, I think
18 that that is more than enough a set of conditions to assure the
19 Court that he's not a danger to the community.  Importantly,
20 some of those concerns also go to risk of flight.
21          Everyone he knows down in Baltimore, a large group of
22 which have made the trip up --
23          THE COURT:  I'm less interested in risk of flight than
24 danger.  And I'm also interested, however, in the issues about
25 prior probation violations and/or poor adjustment to

8

1  supervision.
2      MR. TALKIN:  Your Honor, I -- the problem with
3  addressing that is I don't -- I've only read from the report
4  what was there.  A lot of those allegations were dismissed or
5  stetted (sic), which the closest I can come to New York is an
6  ACD, null process, fairly pretty much what we know here in the
7  federal system, a lot of that conduct.  I didn't see on there a
8  probation violation.
9      THE COURT:  Well, how about, at a minimum, that while
10 he is presumed innocent, the crime with which he's charged
11 occurred during the period he was on parole from his 2002
12 sentence, number one.
13     And number two, the issuance of a bench warrant in
14 connection with his 1999 possession with intent to distribute
15 marijuana?
16     MR. TALKIN:  I went over that bench warrant with my
17 client, Your Honor.  If you look at the timing, as best we can
18 tell from there, it wasn't at the time of arrest.  I don't know
19 if the warrant was issued for some other reason other than not
20 appearing in court.  It's really hard to tell because, as you
21 know, when we get the --
22     THE COURT:  But presumably he knows.
23     MR. TALKIN:  He doesn't know, and that's the problem.
24     But the one thing he does remember -- it was a long
25 time ago, Your Honor.  And if it was the -- if -- the kind of

1  bench warrants that -- not that they're not significant, but
2  aren't for missing a court date, sometimes you don't even know
3  why they're issued, so it's hard to tell.
4      But what he does remember is, when he found out about
5  that, he voluntarily turned himself, he said, to the Wabash
6  Avenue Station in Baltimore. So when he did find out about it,
7  he did.
8      The other thing that, Your Honor, in the complaint it
9  says from 2003 to 2004, and April 2006. But all the conduct in
10 there that's alleged in the complaint all happened in 2006,
11 which was after he was off parole. He was favorably
12 terminated, early termination from parole. And if I -- and
13 this is all from the report. I do not have a rap sheet. In
14 2005 some time. So it's not necessarily the case that the
15 conduct happened. The allegations you have before Your Honor,
16 any specific factual allegations all postdate parole.
17     So unless there's more information -- there's just a
18 general statement of 2003, 2004. I don't know where -- I can't
19 speak to what specifically that conduct is, allegedly. But the
20 conduct that is in this complaint is all in the summer of 2006,
21 which is after he was off parole.
22     So I -- Your Honor, the -- he's going to be under the
23 strictest of pretrial supervision with the home detention and
24 the electronic monitoring, so that clearly will address that
25 concern, because there's not -- he's going to be home, he's

1  going to be checking in, and also he's going to be under the
2  supervision of Ms. Bolger, who's going to watch him.  She's
3  going to watch him because she wants to watch him, and she's
4  going to watch him because it's -- she's one of the main
5  suretors here.  She's putting up her home and also her future
6  livelihood with her husband.  They're willing to do that.
7       So, you know, moral suasion we talk about a lot, in
8  terms of risk of flight.  But I think it's important here in
9  the dangerousness to the community, as well.  I mean, he has a
10 lot of reasons to stay on the straight and narrow here, and I'm
11 certain that he's going to follow them.
12      THE COURT:  All right.  Ms. Strauber.
13      MS. STRAUBER:  Your Honor, just very briefly.  While
14 I'm sure that the defendant's family members will do their very
15 best to make sure that he complies with the terms of pretrial
16 release, if he is released, I think it's worth noting that the
17 convictions that he's had in the past all, or primarily all
18 took place while he was living in Baltimore around these same
19 family members, to the extent that his home detention would be
20 spent in an area in a different part of Baltimore, my
21 understanding is it's roughly twenty minutes away.  So he'd be
22 surrounded by the same family members that -- presumably who
23 have surrounded him since childhood.  And unfortunately, their
24 influence simply has not in the past been enough to dissuade
25 him from this conduct, nor have three prior convictions.

1       And in light of that, the Government does not think
2  that the proposed package, extremely strong though it may be,
3  is sufficient in this case to assure the safety of the
4  community.
5       THE COURT:  How about the defense argument that the
6  conduct charged in the complaint ended a year ago?
7       MS. STRAUBER:  Well, the conduct that's set forth in
8  the complaint, it's true, ended a year ago.  But as Your Honor
9  is aware, that doesn't mean that the Government's investigation
10 ended a year ago.  There was also an ongoing investigation in
11 Baltimore.  And I'm not going to be able to speak about the
12 specifics of that or the evidence from that.  But it's
13 certainly not the Government's position that the defendant, on
14 his own, ceased to be involved in this conduct outside of the
15 time frame that's set forth in the complaint.
16      Also, just because it's been raised, the information
17 provided by one of the coconspirators in this case relates, not
18 only to conduct that occurred from April of 2006 until more
19 recently, but also in the 2003 to 2004 time frame.  So one of
20 the coconspirators has explained, as is set forth in Paragraph
21 11 of the complaint, that his involvement and the direction of
22 the defendant occurred during that time frame, as well.
23      THE COURT:  Anything else?
24      MR. TALKIN:  Just very briefly, Your Honor.  Just
25 talking about that one-year period, I just think the Court

```
 1  focused on it because it's very important.
 2          If Ms. Strauber knows any fact, a single fact that the
 3  investigation revealed that she can reveal to the Court that
 4  Mr. Tazewell was involved in any criminal activity that they
 5  observed, tape-recorded, or anything, I think she should at
 6  least, you know, in a way where I won't figure it out --
 7          THE COURT: Well, it's not so much that. It's the
 8  issue of, if he was part of a bigger investigation, even if his
 9  conduct stopped a year ago, the Government has an interest in
10  the broader investigation, and the arrest of him, as much as
11  they would like to get him off the street, might have
12  jeopardized, so --
13          MR. TALKIN: I understand that, but the other half --
14          THE COURT: All right. Okay.
15          MR. TALKIN: The other half is that he was monitored -
16  -
17          THE COURT: I get the -- I get the point.
18          Bail is set as follows. I am taking a chance on Mr.
19  Tazewell. Don't disappoint me. And if you do, you're going to
20  be bankrupting your entire family. So, presumably, they'll
21  keep a much closer look at you. Bail is set as follows:
22          One-million-dollar personal recognizance bond,
23  cosigned by six financially responsible persons and the
24  grandfather as a seventh person for moral suasion, further
25  supported by $500,000 cash and property.
```

```
1              Travel restricted to the Southern and Eastern
2   Districts of New York, the District of Maryland.  Surrender of
3   travel documents, no new applications.
4              Strict pretrial supervision with home incarceration
5   with electronic monitoring.  No release from the apartment
6   except for court appearances and with advance notice to
7   probation and their consent, meeting with counsel.
8              No release until all of these conditions are met.
9              The defendant is to live with his aunt and uncle, as
10  noticed by -- as described by Mr. Talkin.
11             And I'm writing this on the form, so make sure that
12  you're clear on this, Mr. Tazewell.  Any violation of these
13  conditions, however minor -- and I'm entering the order now --
14  that bail will be revoked.  So any fooling around, you know,
15  any allegation that, you know, one of your alleged
16  coconspirators comes to the house to get instructions on
17  further drug-dealing or whatever, that's presented to the
18  Court, bail is revoked.
19             Obviously, Ms. Strauber, it will take a certain amount
20  of time, both for the electronic monitoring to be put in place,
21  and it usually takes a week or more for the property to be
22  posted.  So if you feel the need to go to the Part 1 Judge,
23  feel free, obviously.  But if you do, just let me know the
24  results, one way or the other.
25             I must warn you, Mr. Tazewell, if you make bail on the
```

14

1   conditions that have been set, and you fail to appear in court
2   whenever you're supposed to, or you violate any of the other
3   conditions that have been set down, then you can be charged
4   with the crime of bail-jumping, you and the relatives and
5   friends who have cosigned the bond and put up the property will
6   not only forfeit all of the cash and/or property posted, but
7   will owe the Government the full $1 million.  In addition, as I
8   said, you could be charged with the crime of bail-jumping.
9   That carries significant additional penalties, and you can be
10  charged with that even if somehow the charges you are facing
11  today were to disappear.  Do you understand that?
12          THE DEFENDANT:  Yes, sir.
13          THE COURT:  All right.  Anything else on this matter?
14          MS. STRAUBER:  Nothing further from the Government,
15  Your Honor.  Thank you.
16          MR. TALKIN:  No.  Thank you, Your Honor.
17          THE COURT:  Okay.  We're adjourned.
18          MR. TALKIN:  Thank you, Judge.
19      (Proceedings concluded.)
20                          *****
21
22
23
24
25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of my knowledge and ability.

*Coleen Rand* (signature)

January 15, 2008

_____
Coleen Rand, AAERT Cert. No. 341
Certified Court Transcriptionist
Rand Reporting & Transcription, LLC