

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York  10007*

August 15, 2008

**BY HAND**

The Honorable Richard M. Berman
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 1330
New York, NY 10007

        Re:    <u>United States v. Tremain Arrnel Tazewell,</u>
                07 Cr. 1035 (RMB)

Dear Judge Berman:

      The Government respectfully submits this letter to inform the Court and counsel of certain evidence that the Government will seek to offer at trial to establish the defendant's knowledge and intent with respect to the crime charged in the Indictment.  Specifically, the Government will seek to offer:  (1) evidence of the defendant's prior narcotics distribution convictions, pursuant to Fed. R. Evid. 404(b) ("Rule 404(b)"); and (2) segments of a video called "Stop Fucking Snitching" in which the defendant appears and makes certain statements probative of both his identity (as "Roc" or "Rock") and his knowledge of the drug distribution business in Baltimore.

<b><u>BACKGROUND</u></b>

**I.**    **The Offense Conduct**

      Tazewell is charged in a one-count Indictment with conspiring with others to distribute or possess with intent to distribute one kilogram and more of heroin, between in or about 2002 and July 2006, in violation of Title 21, United States Code, Sections 846, 841(a)(1) and 841(b)(1)(A).  In sum, between 2002 and July 2006, Tazewell, who distributed heroin in Baltimore with others, sent individuals up to the New York and New Jersey area to purchase the heroin that he distributed in Baltimore.

      Law enforcement learned about Tazewell's role as follows.  On or about July 13, 2006, an individual by the name of Jesse Flores-Hardy was stopped at the US/Mexican border in Hidalgo, Texas.  Customs inspectors found approximately 5.9 kilograms of heroin sewn into Flores-Hardy's clothing.  Flores-Hardy informed law enforcement that he was planning to take the heroin to Manhattan to give it to an individual there.  Flores-Hardy agreed to go through with

The Honorable Richard M. Berman
August 15, 2008
Page 2

the delivery under the supervision of agents of Immigration and Customs Enforcement ("ICE").

Flores-Hardy went to Manhattan with ICE agents, and made recorded conversations to coordinate the delivery of the heroin to a Columbian drug dealer named Luis Sanchez-Lopez. On July 18, 2006, Flores-Hardy delivered the heroin to Sanchez-Lopez on the corner 47th Street and 8th Avenue, New York. Sanchez-Lopez was then arrested, and told law enforcement that he was going to deliver the drugs to a black male – Derrick Madden – in Manhattan. Sanchez-Lopez similarly agreed to go through with that deal under law enforcement supervision.

Meanwhile, Tazewell, whom Madden knew as "Rock" (or "Roc") and "Slim," had instructed Madden to travel from Baltimore to Elizabeth, New Jersey to test heroin for him, and if it was acceptable, to purchase it. Tazewell had given Madden the keys to Tazewell's black Honda Accord to drive up to New Jersey, and gave him a yellow bag containing approximately $35,000 in cash, which was wrapped in rubber bands. On July 17, 2006, as Madden was driving to New Jersey, Tazewell called Madden and told him to give Sanchez-Lopez $4,000 in cash. Madden followed these instructions, and then checked into a hotel. The next day, on July 18, 2006, Tazewell again called Madden and told him to get a sample of the heroin from Sanchez-Lopez, to test the sample, and then provide Sanchez-Lopez with the rest of the money if it was acceptable product.

Madden was arrested after he took the sample from Sanchez-Lopez. Agents found the yellow bag containing approximately $31,000 in Madden's hotel room. The yellow bag also contained a softball uniform, the pants of which had "Rock" handwritten on the inside of the waistband. After Madden was arrested, he told law enforcement that he had traveled to various locations in the New York area, including Manhattan, Brooklyn, New York, and New Jersey, to test and purchase heroin for Tazewell on numerous occasions between 2002 and July 2006.

**II.     The Defendant's Prior Convictions**

   A.     <u>The New York Conviction in 2001</u>

The defendant was convicted, on or about December 31, 2001, in New York Supreme Court, Queens County, of attempted criminal possession of a controlled substance in the third degree, in violation of New York Penal Law 220.16(1).[1] The conduct underlying that conviction is as follows. On or about September 27, 2001, Tazewell and two others drove up to

---

[1] New York Penal Law 220.16(1) provides: "A person is guilty of criminal possession of a controlled substance in the third degree when he knowingly and unlawfully possesses: (1) a narcotic drug with intent to sell it. . ."

The Honorable Richard M. Berman
August 15, 2008
Page 3

Baltimore to purchase heroin from a Columbian named Herman Mareno.  Mareno was in fact a target of the New York City Police Department ("NYPD"), and his telephone calls were being intercepted pursuant to a court order.  Based on the interception of Mareno's calls, police learned that Tazewell and his two co-defendants were waiting at a mall in Queens near Mareno's residence, until Mareno informed them the heroin was ready to pick up.  Police observed Tazewell and his two co-defendants drive a car with Maryland license plates from the mall to a meeting with Mareno, at which they purchased heroin from Mareno.  Tazewell's car was stopped by police after it drove away from the meeting with Mareno but before it left Queens.  All three of the car's occupants, including Tazewell, indicated that they had come up from Baltimore, and were traveling back to Baltimore.   Police recovered a plastic bag from inside the car, which contained three smaller plastic bags with over four ounces of heroin.

      B.      The Baltimore Convictions in 2000

On or about March 13, 2000, the defendant was convicted of two narcotics distribution offenses, namely possession of a controlled substance with intent to manufacture, distribute or dispense it.  The first conviction stemmed from a July 21, 1998 arrest.  Police officers in the Western District of Baltimore observed Tazewell walk past a white truck instructing the truck to circle the block because police were present.  At the same time, the police observed Tazewell clutching something in his right hand very tightly.  When police approached Tazewell, he emptied the contents of his right hand into a white cup.  Police immediately recognized the object in the cup as white-top vials, which was packaging materials for a controlled substance.  Tazewell was arrested.  The cup contained 11 white-top vials, which contained over 12 grams of heroin.

The second conviction stemmed from a May 4, 1999 arrest.   While on patrol, police observed Tazewell placing a clear plastic bag in the dirt beside a tree, and then walk away from the bag.  The police recovered the plastic bag and recognized that it contained a controlled substance.  The defendant was arrested.  The plastic bag contained 38 clear-top vials with more than 39 grams of heroin.

### III.    The "Stop Fucking Snitching" Video Clips

In 2004, "One Love" and "Skinny Suge" produced a video called "Stop Fucking Snitching," the theme of which was to threaten those who inform law enforcement about drug dealers' activities. Tazewell appears in various scenes and makes statements in the video, which is nearly two hours in length. The Government will seek to offer at trial five short clips from the video, totaling approximately six minutes, which are relevant to the facts of the case, as described more fully below.  A copy of the entire video is provided herewith on a CD titled "Stop Fucking Snitching Video"; and copy of the five clips that the Government intends to introduce at trial is provided herewith on a separate CD.  Also enclosed is a draft transcript of the

The Honorable Richard M. Berman
August 15, 2008
Page 4

five video clips.

### Track 1 (1:45 minutes long)

The first video clip shows Tazewell sitting in a Cadillac and talking to another individual, Sherman Kemp, who has been convicted of distributing drugs in Baltimore. Anther male on the video refers to the defendant as "Roc," and Tazewell and Kemp discuss producing champagne under the name "G-Roc" [ph]. Tazewell also indicates that you can only get the champagne from "Pete's Place," which is a bar that Tazewell and Kemp jointly run. The next scene in this clip shows Tazewell at Pete's Place talking about "snitching" on drug dealers. Tazewell states: "everything is street, ain't nobody going back telling nobody this . . ." and "we gotta do what we gotta do out on the streets." The Government expects that a Drug Enforcement Administration ("DEA") Agent knowledgeable of the Baltimore drug trade and familiar with this video in particular will testify that this reference to "street" is to selling drugs on the streets and the quoted statements refer to not informing on drug dealers.

### Tracks 2 and 3 (2:39 and 1:15 minutes long respectively)

The second and third video clips show Tazewell and Kemp (among others) at Pete's Place. In track 2, Kemp pulls wads of cash out of his pocket, which includes, as Tazewell points out "a hundred dollars from a whole nother fucking country." The cash is wrapped in rubber bands. At the beginning of Track 3 (also at Pete's Place), Kemp states that getting money through inheritance ("if you got money from your grandmother dying or your mother passed away or someone died on an airplane") or from a lawsuit ("or you were hurt from when you were born") or from a sport ("or you made your money from baseball, basketball, football and shit") does not "count." Kemp continues that the only money that "count[s]" is "street money, blood money, money in rubber bands," meaning money made from selling drugs on the streets. Kemp then states: "If it don't come in rubber bands, vacuum sealed, freezer bags, or ziplock bags, shit don't count." Tazewell responds: "And trash bags." According to Baltimore DEA agents, this is a reference to drugs, because drugs are typically packaged in freezer bags or ziplocks bags, and are vacuum sealed.[2]

### Track 4 (4 seconds long)

The fourth clip shows Madden and another individual at Pete's Place.

---

[2]The reference to money in "rubber bands" in track 3 strongly suggests that the money which is thrown on the floor in track 2 is drug money, because it is wrapped in rubber bands. This is also relevant because the money that was recovered from the yellow bag when Madden was arrested was wrapped in rubber bands.

Track 5 (51 seconds long)

The last clip is the roll of the film's credits at the end of the video. The credits state "Special Thanks To" a number of individuals, including the name "Roc."

## DISCUSSION

### I. TAZEWELL'S PRIOR CONVICTIONS

#### A. Tazewell's Prior Convictions Should Be Admitted Under Rule 404(b) To Establish Knowledge, Intent, And Identity

Tazewell's prior heroin distribution convictions are admissible under Rule 404(b) to establish Tazewell's knowledge, intent, and the absence of mistake or accident, and to establish his identity as the person who sent Madden to New Jersey to test and purchase the heroin. Specifically, his New York conviction establishes that he is familiar with how to purchase heroin from Columbian drug dealers in the New York area, and his Baltimore convictions establish that he is familiar with the heroin distribution business in Baltimore. Indeed, the inference from his New York conviction, for which Tazewell served jail time, is that, rather than risk being caught in the act of buying the heroin in the New York area, Tazewell thereafter decided to send others to the New York area to test and purchase the heroin for him.

Rule 404(b) provides, in relevant part, that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

Fed. R. Evid. 404(b).

In United States v. Pitre, the United States Court of Appeals for the Second Circuit set forth the standards for assessing the admissibility of evidence under Rule 404(b):

> First, the district court must determine if the evidence is offered for a proper purpose, one other than to prove the defendant's bad character or criminal propensity. If the evidence is offered for a proper purpose, the district court must next determine if the evidence is relevant to an issue in the case, and, if relevant,

The Honorable Richard M. Berman
August 15, 2008
Page 6

>whether its probative value is substantially outweighed by the danger of unfair prejudice. Finally, upon request, the district court must give an appropriate limiting instruction to the jury.

960 F.2d 1112, 1119 (2d Cir. 1992) (internal citation omitted).

The Second Circuit has taken an inclusionary approach to admitting evidence under Rule 404(b) and, therefore, evidence of prior crimes, wrongs, or acts "is admissible for any purpose other than to show a defendant's criminal propensity." Id. at 1118-19 (internal quotation marks and citation omitted); see United States v. Edwards, 342 F.3d 168, 176 (2d Cir. 2003); United States v. Tubol, 191 F.3d 88, 95 (2d Cir. 1999). The Second Circuit thus "accord[s] considerable deference to a district court's decision to admit such evidence, and . . . will reverse only for abuse of discretion." United States v. Paulino, 445 F.3d 211, 221 (2d Cir. 2006); see Tubol, 191 F.3d at 95 (same).

In narcotics cases in particular, the Second Circuit has held that where a defendant raises a claim that he lacked the knowledge, intent, or motive to distribute or possess with intent to distribute narcotics, the Government is permitted to introduce evidence of the defendant's prior narcotics activities. See United States v. Arango-Correa, 851 F.2d 54, 60 (2d Cir. 1998) (evidence of defendant's general knowledge of narcotics transactions admissible where knowledge was at issue); United States v. Bruno, 873 F.2d 555, 561-62 (2d Cir. 1989) (evidence of prior narcotics activity admissible where "mere presence" defense raised); United States v. Fernandez, 829 F.2d 363, 367 (2d Cir. 1987) (per curiam) (same); United States v. Tussa, 816 F.2d 58, 68 (2d Cir. 1987) (evidence of prior narcotics-related crimes admissible where intent was at issue); United States v. Martino, 759 F.2d 998, 1004-05 (2d Cir. 1985) (evidence of eleven-year old prior narcotics conviction admissible where knowledge and intent were at issue).

It is indisputable that Tazewell's prior convictions for narcotics distribution demonstrates his general knowledge of and participation in the narcotics trade. See Pitre, 960 F.2d at 1119 (admitting evidence of prior narcotics transactions as probative of the defendants' "intent or knowledge in connection with the [narcotics] crime charged.").

More importantly, however, the facts underlying these convictions are highly relevant to the facts that will be adduced by the Government at trial. Madden was instructed to travel to New Jersey to test and purchase heroin from a Columbian drug dealer, Sanchez-Lopez. Tazewell's New York conviction shows that Tazewell was familiar with how to obtain heroin from Columbian drug dealers in the New York area, because that is precisely what he did in 2001: he was arrested in Queens after having driven up from Baltimore and bought heroin from a Columbian drug dealer. Moreover, the heroin that Madden was instructed to purchase for Tazewell was clearly intended for further distribution by Tazewell and his co-conspirators in

The Honorable Richard M. Berman
August 15, 2008
Page 7

Baltimore. Madden was to travel back to Baltimore with the drugs – nearly six kilos in quantity. Madden had also purchased heroin for Tazewell in the New York area on various occasions before, and had driven the heroin back to Baltimore.

The Baltimore convictions show that Tazewell was familiar with, and participated in, distributing heroin in Baltimore because he was caught in possession of multiple vials of heroin, which he had unsuccessfully tried to discard before being confronted by police.

Thus, the prior convictions show Tazewell's knowledge and intent with respect to the narcotics conspiracy charged in the Indictment, and they also support the other evidence in the case which shows that it was Tazewell who was directing Madden to New Jersey to test and purchase the heroin.

### B. The Proffered Evidence Satisfies The Requirements Of Fed. R. Evid. 403.

The proffered Rule 404(b) evidence satisfies the requirements of Fed. R. Evid. 403 ("Rule 403"), which sets forth a balancing test for determining admissibility. Rule 403 provides that evidence, although relevant,

> may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

In this case, the proffered evidence is highly relevant and probative of the crimes charged in the Indictment, and there is no basis to exclude it as unfairly prejudicial under Rule 403. For the reasons discussed above, the evidence of Tazewell's prior convictions is highly probative of his knowledge and intent, and of the fact that it was Tazewell who was directing Madden to New Jersey to test and purchase the heroin.

In contrast, this evidence is not *unfairly* prejudicial to the defendant. The fact that Tazewell was previously convicted of narcotics distribution offenses involving heroin is no worse or more inflammatory than the charged crime of conspiracy to distribute heroin. Therefore, there is no danger that the admission of the proffered evidence would elicit an emotional response from, or otherwise inflame, the jury, and accordingly, the Government should be permitted to offer such evidence. See Advisory Committee's Notes on Rule 403 ("'Unfair prejudice' within [Rule 403's] context means an undue tendency to suggest decision on an improper basis commonly, though not necessarily, an emotional one."). Indeed, the Second Circuit repeatedly has upheld the admission of evidence of prior narcotics transactions to prove intent or knowledge where such evidence did not involve conduct any more sensational,

The Honorable Richard M. Berman
August 15, 2008
Page 8

disturbing, or serious than the crimes charged.  See, e.g., United States v. Williams, 205 F.3d 23, 34 (2d Cir. 2000); Pitre, 960 F.2d at 1120; Roldan-Zapata, 916 F.2d at 804.

With respect to the timing of the Government's introduction of evidence under Rule 404(b), the Second Circuit has held that "as a general rule, the offer of evidence to prove the defendant's intent or knowledge should await the conclusion of the defendant's case. However, where it is apparent that intent will be in dispute, evidence of prior or similar acts may be introduced during the government's case-in-chief."  Pitre, 960 F.2d at 1120; see United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994).  Similarly, the Second Circuit has held that if "the evidence is offered to prove that the defendant committed the act charged in the indictment . . . the evidence may be offered during the prosecution's case-in-chief, unless the defendant's commission of the act is not a disputed issue."  United States v. Figueroa, 618 F.2d 934, 939 (2d Cir. 1980).  Accordingly, in this case, the Government should be allowed to offer the above-proffered evidence as part of its case-in-chief.

### C. In the Alternative, Evidence Of Tazewell's Convictions Should Be Admitted For Cross-Examination Purposes If Tazewell Testifies At Trial.

Even if the Court does not permit evidence of Tazewell's heroin distribution convictions to be offered during the Government's case-in-chief, the evidence should be admissible on cross-examination should Tazewell decide to testify at trial.

"Central to the proper operation of the adversary system is the notion that 'when a defendant takes the stand, the government be permitted proper and effective cross-examination in an attempt to elicit the truth.'"  United States v. Garcia 936 F.2d 648, 653 (2d Cir. 1991) (quoting United States v. Havens, 446 U.S. 620, 626-27 (1980)).  A testifying defendant "has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts."  Brown v. United States, 356 U.S. 148, 155 (1958) (quotation omitted).  Thus, to protect the "truth-seeking function of a trial," the government is given "great leeway" in its cross-examination of the defendant.  United States v. Vega, 589 F.2d 1147, 1151 n.3 (2d Cir. 1978).  Indeed, "[a] defendant has no right to avoid cross-examination into the truth of his direct examination, even as to matters not related to the merits of the charges against him."  United States v. Payton, 159 F.3d 49, 58 (2d Cir. 1998).

"Once a defendant has put certain activity in issue by offering innocent explanations for or denying wrongdoing, the government is entitled to rebut by showing that the defendant has lied."  United States v. Beverly, 5 F.3d 633, 639 (2d Cir. 1993) (citing United States v. Mills, 895 F.2d 897, 907 (2d Cir. 1990)).  For example, in United States v. Garcia, the Second Circuit upheld the questioning of one of the defendants about his recent prior cocaine use, because it "exposed [the defendant's] lack of candor regarding his knowledge" of the contents of the package of cocaine he had carried to the scene of his arrest, and "was particularly

The Honorable Richard M. Berman
August 15, 2008
Page 9

relevant in light of [his] attempt to portray himself as an unwitting bystander." Garcia, 936 F.2d at 654.

If, in this case, Tazewell takes the stand and denies that he has any familiarity with the heroin distribution business in Baltimore, or the means by which heroin can be obtained from Columbian drug dealers in the New York/New Jersey area, for example, the Government should be permitted to use his prior convictions to rebut those claims and demonstrate his knowledge of, and familiarity with, the drug trade in Baltimore, including the means of obtaining drugs from Columbian suppliers in the New York/New Jersey area.

## II.   THE "STOP SNITCHING" VIDEO CLIPS

The limited clips that the Government seeks to offer from the "Stop Fucking Snitching" video should be admitted under Rule 403 because their probative value is high and they are not unfairly prejudicial to the defendant. The clips the Government seeks to offer either contain the Tazewell himself making various statements or show Madden at Tazewell's bar, Pete's Place. The clips are probative of Tasewell's knowledge of and participation in the drug business in Baltimore. In addition, the clips establish that at least one of Tazewell's alias is "Roc" (or "Rock"), and establish Tazewell's association with Madden.

Specifically, track 1, which first shows Tazewell in a car and then shows him at Pete's Place establishes (1) that Tazewell is known as "Roc" (he is called "Roc" in the clip and discusses naming a champagne "G-roc"); (2) that Tazewell admitting that he is familiar with the drug distribution business (Tazewell discusses "snitching" on drug dealers and selling drugs on the streets).

Tracks 2 ad 3 similarly show Tazewell's knowledge of and participation in the drug business. For example, track 2 shows Kemp throwing money wrapped in rubber bands on the floor, and Kemp discusses with Tazewell his opinion that only drug money, rather than inherited or earned money, "counts." Similarly, the discussion of "vacuum sealed freezer bags" and "trash bags" shows Tazewell's familiarity with how to package drugs for distribution on the streets. The discussion of money wrapped in "rubber bands" is also relevant to the facts the Government intends to introduce at trial because the money found in the bag that Tazewell gave to Madden was itself wrapped in rubber bands.

Track 4 shows Madden at Pete's Place. The Government expects that Madden will testify that he visited Pete's Place and "hung out" with Tazewell at Pete's Place on a number of occasions. This clip will corroborate that testimony.

The last track is simply a list of film credits. Because credit is given to "Roc," it is further evidence that "Roc" is Tazewell's alias.

The Honorable Richard M. Berman
August 15, 2008
Page 10

      Against the above-described probative value of the limited clips the Government seeks to offer, the defendant cannot establish that this evidence is unfairly prejudicial to him. The Government does not seek to introduce statements that are made outside of Tazewell's presence. Moreover, the fact that Tazewell is discussing narcotics trafficking is no more inflammatory than the charged conspiracy.

## **CONCLUSION**

      For the foregoing reasons, the Government respectfully requests that the Court allow the introduction at trial of the evidence set forth above. The Government further requests leave to supplement this motion should it develop additional evidence that is admissible pursuant to Fed. R. Evid. 404(b).

      Respectfully submitted,

      MICHAEL J. GARCIA
      United States Attorney
      Southern District of New York

      By:  __/s/ Antonia Apps_____
      Antonia M. Apps
      Kenneth Polite
      Assistant United States Attorneys
      Tel.: (212) 637-2198/2412

cc:    Sanford Talkin, Esq.